UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

M-CUBED, LLC,

             Plaintiff(s),

    v.

MAERSK, INC., et al.,

             Defendant(s).

NO. C06-1403MJP

ORDER ON CROSS-MOTIONS FOR
PARTIAL SUMMARY JUDGMENT

The above-entitled Court, having received and reviewed:

1.     Defendants' Motion for Partial Summary Judgment to Limit Liability (Dkt. No. 37)

2.     Plaintiff's Opposition to Maersk Defendants' Cross-Motion for Partial Summary Judgment

      (Dkt. No. 60)

3.     Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 42)

4.     Maersk Defendants' Response to M-Cubed's Cross-Motion for Partial Summary Judgment

      (Dkt. No. 64)

5.     Notice of Hong Kong Court Decision Ordering Release of Cargo (Dkt. No. 72)[1]

all exhibits and declarations attached thereto, and having heard oral argument, makes the following

ruling:

     IT IS ORDERED that Plaintiff's motion for partial summary judgment is    DENIED.

     IT IS FURTHER ORDERED that Defendants' motion for partial summary judgment is

GRANTED.

---

[1]  Regarding Plaintiff's Motion for Partial Summary Judgment, a reply (Dkt. No. 74) was filed on October 31. 2007.  It is the practice of this Court not to entertain replies on cross-motions for summary judgment (Defendants did not file a reply in support of their motion), and Plaintiff's reply was not considered in this instance.

**Background**

Plaintiff purchased a Russian MiG fighter jet in the Ukraine and "de-militarized" it by removing its weapons systems.  Agents of Defendants A.P. Moller–Maersk A/S and Maersk, Inc. ("Maersk") arranged to transport the jet to the United States in two shipments.  One shipment contained the wings and engine, the other contained the fuselage; the first shipment made it to the destination point (Tacoma), the second did not.

Plaintiff contracted with a freight-forwarder in Europe (ARGO Bohemia SRO) to ship the fuselage from Ukraine to Tacoma.  ARGO hired a "sub-freight forwarder" (Skoda Tatra Forwarding – "STF") who in turn hired Maersk.  A Maersk Czech shipping agent (Mr. Tichy) made the shipping arrangements – STF requested a Far East (all-ocean) routing because the fuselage was "out-of-gauge" (oversized) cargo and could not easily be transported over land.  The planned route for the fuselage underwent several changes, but as of February 13, 2006, the "Booking Confirmation" prepared by Maersk and e-mailed to STF (Tichy Decl., Exh. 1) reflects that the cargo would be "transhipped" (i. e, transferred to another vessel for the next leg of the delivery route) at Hong Kong.  An amended Booking Confirmation prepared on February 24, 2006 (Id., Exh. 2) and addressed to STF contains the same information.  Copies of both of these documents were e-mailed to STF.  Id. at ¶¶ 10, 11.

Hong Kong is a port which requires special licenses for the import of "strategic commodities," a category which includes military equipment.  Offloading an item for transhipment is considered "importing."  It is undisputed that Maersk did not obtain the requisite import licenses prior to bringing the fuselage to Hong Kong.  The testimony of Defendants' agents is that they either did not think or were not certain that the Hong Kong authorities would require the licenses because the jet had been "de-militarized."  Deposition of Tichy, 92:1-9, 95:1-10, 146:21-147:27; Decl. of Mak,      ¶¶ 7-8; Decl. of Ma, ¶ 8.

The fuselage was loaded on the CAROLINE MAERSK on March 11, 2006 in Italy and then proceeded through the Suez Canal on to Oman, Singapore and China before reaching Hong Kong.

ORD ON CROSS-MTNS FOR SUMM JMT - 2

1    The shipment arrived in Yantian, China on the morning of April 1, 2006.  That evening, Maersk

2    Yantian received photos of the fuselage and (suspecting at that point that it might be considered a

3    "strategic commodity") contacted the Maersk Hong Kong office to see if the requisite licenses had

4    been obtained.  They had not.

5           After weighing their options (offloading the fuselage in China, keeping it aboard the

6    CAROLINE MAERSK for transport to Los Angeles or taking it to Hong Kong), Defendants' agents

7    decided to take the MiG to Hong Kong and offload it for transhipment as originally planned.   Angela

8    Chan, the Senior Manager of Local Operations for Maersk Hong Kong, testified that, while she was

9    aware that the fuselage would be held by the Hong Kong port authorities pending a determination of

10   its status (as a "strategic commodity" or not), the most serious consequence she envisioned was a

11   temporary detention of the cargo while "retrospective licenses" were obtained for its transhipment,

12   and possibly a fine levied against Maersk for the unlicensed merchandise.  Deposition of Chan, 21:4-

13   13; Decl. of Chan, ¶ 8.

14          At 1:15 a.m. on April 2, 2006, Hong Kong Customs was notified that a MiG fuselage would

15   be offloaded without any import or export licenses.  An hour before the vessel docked in Hong Kong,

16   Maersk Yantian notified Maersk Hong Kong and Maersk Czechoslovakia that the fuselage would be

17   offloaded and that, because no licenses had been obtained, the "aircraft will be detained by HKG

18   Customs" and "there's no promised date when this container can be loaded."  (Mak Dep., Exh. 40.)

19          The fuselage was offloaded and detained by the port authorities.  Several days after it had been

20   detained, the cargo was forfeited and seized as an unlicensed "strategic commodity."  While Maersk

21   was acquitted of criminal charges filed against it for the unlicensed importing of the MiG, a civil action

22   was undertaken to declare the forfeiture improper and obtain the return of the cargo.[2]

23   

24          [2]  During the pendency of these motions, Defendants filed a document informing the Court that, on October 29,
     2007, the Hong Kong court ruled that the fuselage was not properly forfeited and should be returned to its owner.  The
25   appeal of that decision is still pending.  Notice of Hong Kong Court Decision Ordering Release of Cargo (Dkt. No. 72).

26   **ORD ON CROSS-MTNS FOR SUMM JMT - 3**

1      The cargo contract between the parties contained their agreement to be bound by the Carriage

2  of Goods by Sea Act ("COGSA") – the aspect of that statutory scheme at issue here are clauses

3  (6.2(b) and 7.2(b)) of the Bill of Lading; Morisset Decl., Exh. C) which limit Defendants' liability for

4  lost or damaged cargo to $500:

> Where Carriage includes Carriage to, from or through a port in the United States of America
> and US COGSA applies by virtue of clauses 5.1 or 6.2(b) neither the Carrier nor the Vessel
> shall in any event be or become liable in an amount exceeding US$500 per Package or
> customary freight unit.  Bill of Lading, Clause 7.2(b)

Plaintiff is seeking damages in excess of $4 million.

**Discussion**

Standard of proof

7      Summary judgment is not warranted if a material fact exists for trial.  Warren v. City of

Carlsbad, 58 F.3d 439, 441 (9th Cir.  1995).  The underlying facts are viewed in the light most

favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986).  "Summary judgment will not lie if. . . the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  The party moving for summary judgment has the burden to show initially the absence of a

genuine issue concerning any material fact.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970).

This can be done be either producing evidence negating an essential element of plaintiff's claim, or by

showing that plaintiff does not have enough evidence of an essential element to carry its ultimate

burden at trial.  Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1103 (9th Cir.

2000).

       However, once the moving party has met its initial burden, the burden shifts to the nonmoving

party to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial.  Celotex Copr. v. Catrett, 477 U.S. 317, 323-24 (1986).  To

discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have

ORD ON CROSS-MTNS FOR SUMM JMT - 4

1   evidence showing that there is a genuine issue for trial.  Id.. At 324.  In considering a motion for

2   summary judgment, however, "the court must draw all reasonable inferences in favor of the

3   nonmoving party, and it may not make credibility determinations or weigh the evidence."  Anderson,

4   477 U.S. at 250-51.  Additionally, "at the summary judgment stage the judge's function is not . . .  to

5   weigh the evidence . . .  but to determine whether there is a genuine issue for trial."  Liberty Lobby,

6   477 U.S. at 249.

7   COGSA and the limitation of liability

8        "COGSA regulates the terms of international ocean carriage covered by bills of lading.

9   Section 4(5) of COGSA limits a carrier's liability for loss and damage to goods shipped" to a value not

10   to exceed $500 per "package."  Vision Air Flight Service, Inc. v. M/V National Pride, 155 F.3d 1165,

11   1168 (9th Cir. 1998).  That limitation is reflected in Clause 7.2(b) of the Bill of Lading *supra*.

12        This COGSA liability limit is only effective "if the shipper is given a 'fair opportunity' to opt

13   for a higher liability by paying a correspondingly greater charge."  Nemeth v. General Steamship

14   Corp., Ltd., 694 F.2d 609. 611 (9th Cir. 1982).  If the bill of lading expressly limits the carrier's

15   liability and invites the contracting party to opt for greater liability, then the COGSA notice

16   requirement is satisfied.  Vision Air, 155 F.3d at 1169.  Plaintiff does not controvert Defendants'

17   assertion that it was given (at Clause 7.3 of the Bill of Lading) the option of declaring a higher value

18   for the cargo for purposes of contracting for a higher amount of compensation in the event of liability,

19   and that it did not declare a higher value for the fuselage. Def. Mtn., p. 5. The Court is satisfied that,

20   absent some other operation of law, the liability limitation is valid under COGSA.

21        In the common law tradition, the "doctrine of deviation" operated to deny liability defense to

22   errant carriers.  "Upon deviation from the scheduled voyage, a carrier was not permitted to rely upon

23   exculpatory provisions in the bill of lading to avoid or limit its liability for loss or damage to the

24   cargo."  Id., 1170-71.  This "geographic deviation" principle eventually evolved to cover other

25   circumstances wherein a carrier had "exposed the cargo to unreasonable and unjustifiable risks not

26   **ORD ON CROSS-MTNS FOR SUMM JMT - 5**

contemplated by the parties" irrespective of whether the carrier had strayed from the agreed-upon delivery route.  Id.   These breaches came to be known as "quasi-deviations."

The issue of whether the deviation doctrine survived the enactment of COGSA has long been settled in this circuit, which operates under the rule that the doctrine of deviation is still viable in the world of post-COGSA litigation, and that an unreasonable deviation by a carrier can still void the $500 liability limitation.  *See* Nemeth, Vision Air, *supra*.  However, "the enactment of COGSA altered the contours of the deviation doctrine and limited the circumstances under which it applies."  Vision Air, 155 F.3d at 1172.  It is in that context that the Court examines the parties' arguments concerning the application of the deviation doctrine to the facts of this case.

Geographic deviation

Although Plaintiff claims that the evidence in this matter "demonstrates both a deviation and a quasi-deviation" (Pltf. Mtn., p. 18), it devotes the bulk of its argument to the alleged quasi-deviation represented by the failure to obtain the requisite licenses for transhipment in Hong Kong and the resulting seizure of the cargo.  Nevertheless, the Court examines the undisputed material facts for evidence of a geographic deviation.

Maersk does not deny that, as Plaintiff claims, the original route designated for the fuselage was not the route which was ultimately taken.  However, Maersk also provides evidence that the route changes were not only documented (by documents entitled "Booking Confirmation" and "Booking Amendment"), but that those documents also indicated that the fuselage would be "transhipped" (offloaded and re-loaded onto another vessel) at Hong Kong. Decl. of Tichy, ¶¶ 7-11.  Plaintiff has not disputed the authenticity of these documents nor the information they contain.

The Maersk Czech agent responsible for documenting the changes to the shipping route also provided testimony that both the Booking Confirmation and Booking Amendment were e-mailed to STF, the "sub-freight forwarder" hired by the freight forwarding company with whom Plaintiff contracted for delivery of their jet.  Id. at ¶¶ 10-11.  It is STF with whom Maersk made the

1    arrangement to ship the fuselage and parts (Tichy Deposition, 8:10-13, 13:3-6, 38:19-25, and 57:17-

2    19; Morisset Decl., Exh. B), and who acted as Plaintiff's agent in this matter.  Plaintiff has provided no

3    case authority that notice to a shipper's agent of routing changes does not constitute notice to the

4    shipper.  The Court finds no evidence of "geographic deviation" under these facts.

5    Quasi-deviation

6            While "deviation" originally referred to departures from a scheduled route, eventually it came

7    to mean "any variation in the conduct of a ship in the carriage of goods whereby the risk incident to

8    the shipment will be increased."  Vision Air, 155 F.3d at 1172 (citing G.W. Sheldon & Co., v.

9    Hamburg Amerikanische Packetfahrt-Actien-Gesellschaft, 28 F.2d 249, 251 (3d Cir. 1928)).  The list

10   of transgressions included "delay in carrying the goods, failure to deliver the goods at the port named

11   in the bill of lading and carrying them farther to another port, or bringing them back to the port of

12   original shipment and reshipping them."  Id.

13           However, as the Vision Air court observed, "the enactment of COGSA altered the contours of

14   the deviation doctrine and limited the circumstances under which it applies."  In fact, in the wake of

15   COGSA, courts have tended towards sharply limiting the doctrine and restricting its application,

16   "especially in the context of quasi-deviation."  Id. at 1173.  The result is a legal landscape in which

17   neither negligence, lack of due diligence, gross negligence or even recklessness is sufficient to create

18   an "unreasonable deviation."  In fact, only "a carrier's intentional destruction of the very goods it

19   contracts to transport constitutes an unreasonable deviation which renders inapplicable COGSA's

20   limitation of liability provisions."  Id. at 1175.

21           It is against this backdrop that Plaintiff's allegations that Maersk's decision to unload the

22   fuselage in Hong Kong constitutes a quasi-deviation must be viewed.  Plaintiff correctly points out

23   that it is not necessary that the Maersk agents actually intended or desired the seizure and forfeiture of

24   the cargo when they off-loaded it from the CAROLINE MAERSK.  The holding in Vision Air is clear:

25

26   **ORD ON CROSS-MTNS FOR SUMM JMT - 7**

1    if the actor "'believes the consequences are <u>substantially certain</u> to result' from his act, then the actor

2    will be found to have acted with intent."  <u>Id.</u> at 1176 (citations omitted) (emphasis supplied).

3            But even viewing the evidence in the light most favorable to Plaintiff, and making all inferences

4    from that evidence which favor Plaintiff's theory, the Court still must find in Defendants' favor on

5    summary judgment.  The testimony of every agent of Maersk who had a part in the decisionmaking

6    process which resulted in the ultimate seizure of the fuselage (<u>see</u> Depositions and Declarations of

7    Tichy, Mak and Chan) is uniform: Defendants' agents either believed that the strategic commodity

8    import license would not be required (because the jet had been "de-militarized") or believed that, at

9    worst, the cargo would be detained temporarily, a "retrospective license"obtained, and a fine levied

10   against Maersk before the item was permitted to be re-loaded and continue on to its ultimate

11   destination.

12           Plaintiff has failed to produce a single piece of evidence which either directly proves or from

13   which it could be reasonably inferred that any of Defendants' agents were "substantially certain" that

14   the Hong Kong authorities would permanently seize the fuselage and declare it forfeit.  Plaintiff makes

15   much of an e-mail from Henry Ma, an employee at Maersk Yantian, who acknowledges that, once

16   offloaded, the fuselage would be "detained" with no promised date for resumption of its delivery.

17   (Deposition of Mak, Exh. 40.)  Plaintiff tries to treat this as a smoking pistol – proof positive that

18   Defendants' agents knew the jet would be seized and forfeited – but that stretches the meaning of

19   "detained" too far.   The deposition testimony and declarations of Defendants' agents indicate their

20   belief that the fuselage would be kept for a period of time and then released (after the licenses had

21   been obtained retroactively and/or a fine paid), which the Court finds more consistent with the use of

22   the word "detained."[3]

23

---

24           [3]  "Detain" is defined as "1. To keep from proceeding; *delay or retard*.  2.  To keep in custody or *temporary
     confinement*."  The American Heritage Dictionary of the English Language (4th Ed., 2000) (emphasis supplied).  The

25   connotations of the term stress the impermanent nature of the restraint, which is consistent with the testimony of
     Defendants' agents that they believed the fuselage would be released after an indeterminate period.

26

1    Plaintiff expends a significant portion of its briefing examining in depth the alternate courses of

2  action Defendants could have undertaken that would have prevented the forfeiture of the cargo.

3  Without commenting on the merits of any of those arguments, the Court does find them to be of

4  marginal relevance.  The issue is not whether Maersk might have done something differently and

5  thereby avoided the undesirable result (which might be germane on the issue of negligence or

6  recklessness); the issue is whether what Defendant actually did was done with deliberate intent or a

7  "substantial certainty" that the undesirable result would occur.

8    The bar set by <u>Vision Air</u> is high.  Plaintiff has failed to clear it.  Defendant Maersk is entitled

9  to summary judgment as a matter of law that the liability limitation contained in their contract with

10  Plaintiff is valid, not subject to the deviation doctrine, and restricts Plaintiff's damages for the loss of

11  their cargo to $500.

12                                              **Conclusion**

13    Although the deviation doctrine still enjoys some vitality following the adoption of COGSA, its

14  application is sharply limited.  Plaintiff has failed to present evidence which raises genuine issues of

15  material fact regarding (1) whether the route change for the delivery of their cargo constituted a

16  "geographic deviation" and (2) whether the decisions made by Defendants' agents which resulted in

17  the seizure of Plaintiff's property were done with "substantial certainty" that the cargo would be

18  forfeit to the Hong Kong authorities.

19    Defendants have demonstrated that there are no genuine disputes of material facts and that

20  they are entitled to summary judgment as a matter of law that the liability limitation provision of their

21  shipping contract was valid and operative, and the Court so orders.

22    The clerk is directed to provide copies of this order to all counsel of record.

23    Dated:  November _29__, 2007

24

25                                              Marsha J. Pechman
                                             U.S. District Judge

26  **ORD ON CROSS-MTNS FOR SUMM JMT - 9**